UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TAMARA PICKETT,

       Plaintiff,

 -against-              3:13-CV-0776 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM-DECISION and ORDER

**I. INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 13 ("Plaintiff's Brief"); 16 ("Defendant's Brief"); 22 ("Plaintiff's Reply Brief). For the following reasons, the judgment of the Social Security Administration ("SSA") is affirmed.

**II. BACKGROUND**

 **A. Plaintiff's Medical Records**

In 2008, Plaintiff Tamara Pickett ("Plaintiff") was hit by a forklift while working as a forklift operator, causing a tear in the meniscus of her left knee. Dkt. No. 11 ("Record") at 261.[1] On February 26, 2009, Plaintiff was treated by Dr. Thomas Van Gorder for repeated swelling and increased difficulties in her left knee. R. at 260. On April 9, 2009, Dr. Van Gorder noted that Plaintiff was still having difficulties with her left knee; he re-prescribed Celebrex and authorized an MRI. R. at 259. On May 13, 2009, Dr. Van Gorder noted that Plaintiff's MRI revealed significant

---

[1] Citations to the Record are to the pagination assigned by the SSA.

patellofemoral arthrosis of her left knee, which was confined to her patellofemoral joint, and Dr. Van Gorder recommended a patellofemoral knee replacement. R. at 258. On September 17, 2009, having failed conservative care, Plaintiff wanted to receive partial knee replacement of the patellofemoral joint, which was approved on September 21. R. at 257. On November 9, 2009, Dr. Van Gorder performed patellofemoral joint replacement on Plaintiff's left knee. R. at 224. On November 20, 2009, Dr. Van Gorder noted that Plaintiff was doing very well after the operation. R. at 256. Plaintiff was able to fully extend her knee and could flex to almost ninety degrees. Id. She could move her foot without difficulty, and "X-rays reveal[ed] excellent alignment of prosthetic components." Id. On December 18, 2009, Dr. Van Gorder noted that Plaintiff did not have much pain in her knee, though she had "some discomfort with range of motion," "flexes to about ninety degrees," and had "difficulty with straight leg raising." R. at 255. On January 15, 2010, Dr. Van Gorder observed that Plaintiff could flex just past ninety degrees, and that her strength was improving. R. at 254. Plaintiff's knee showed swelling and she had difficulty moving it, but she could move her ankle and foot without difficulty. Id.

On February 26, 2010, Dr. Van Gorder noted that Plaintiff was not having as much pain and could flex to 110 degrees, but was unable to return to her previous work activities. R. at 253. On April 9, 2010, Dr. Van Gorder observed that Plaintiff had "a little puffiness" in her left knee and some difficulties with activities including stairs and prolonged walking and could flex to about 110 to 115 degrees. R. at 252. On May 21, 2010, Dr. Van Gorder noted that Plaintiff could flex to about 110 degrees but still had a little difficulty with active full extension of her left knee. R. at 251. However, in general she had been slowly improving, including with her gait. Id. Dr. Van Gorder opined that Plaintiff could not work at her previous job, and she "would require a sit down

2

job with the knee partial replacement as well as right total hip replacement." Id. On July 21, 2010, Dr. Van Gorder noted that Plaintiff had some increased soreness of the knee, a little bit of puffiness of the knee, and decreased range of motion, and could flex to only ninety-five degrees. R. at 250. Again, Dr. Van Gorder opined that Plaintiff could not return to work at her previous job. Id.

On September 24, 2010, Dr. Sandra Boehlert performed a consultative internal medicine examination on Plaintiff. R. at 261. Plaintiff received a right hip replacement in 1995 due to a fracture that was initially diagnosed in 1979. Id. Plaintiff reported that her hip was much better after the replacement, and that she essentially had no complications from the procedure. Id. After the replacement, she returned to work but had some mild persistent pain in her left hip during walking or any exertion. Id. Dr. Boehlert noted that Plaintiff had chronic swelling and pain in her knees, and could not stand repetitively after she received the partial knee replacement in 2009. Id. Plaintiff had normal gait and stance, used no assistive devices, and could rise from a chair without difficulty, but could not walk on her left toes due to her left knee pain. R. at 262-63. She could squat one third of the way down limited by right hip and knee pain. Id. Plaintiff's cervical spine showed full flexion, yet her lumbar spine showed flexion limited to seventy-five degrees. R. at 263. Her right hip had full flexion, interior rotation of thirty degrees, and exterior rotation of forty degrees. Id. Her left knee was limited to five degrees of extension and twenty-five degrees of flexion limited by pain, and her patella was slightly deviated on the lateral side. Id. Dr. Boehlert concluded that Plaintiff had moderate limitation to repetitive standing and sitting, and that she should change positions frequently. R. at 264. Dr. Boehlert also concluded that Plaintiff had a mild to moderate limitation to heavy ambulation and a moderate limitation to heavy exertion in the standing position. Id. On October 1, 2010, relying on the medical evidence in the Record, Dr. S.

3

Putcha, a doctor with New York State Office of Temporary and Disability Assistance, concluded that Plaintiff could perform sedentary work and that her symptoms were partly credible. R. at 78-83, 267-68. In particular, Dr. Putcha concluded that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk with normal breaks for at least two hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday. R. at 79. Dr. Putcha also concluded that Plaintiff could only occasionally perform climbing, balancing, stooping, kneeling, crouching, and crawling due to right total hip and knee pain. R. at 80.

On October 22, 2010, Dr. Van Gorder noted that Plaintiff had full extension in her knee and flexed to about ninety-five degrees. R. at 275. Plaintiff had satisfactory quad and hamstring strength and was trying to find jobs that allowed her to spend more time sitting down. Id. On March 17, 2011, Dr. Van Gorder noted that Plaintiff still had some difficulties with her left knee. R. at 274. Plaintiff's knee had full extension and could flex to about ninety-five degrees, and her gait was satisfactory. Id. However, Dr. Van Gorder diagnosed that Plaintiff had about a fifty percent loss of use of her left knee and might need further surgery in the future. Id. In a medical assessment form, Dr. Van Gorder concluded that Plaintiff could continuously lift eleven to twenty pounds and occasionally lift twenty-one to fifty pounds. R. at 276. Plaintiff could continuously carry eleven to twenty pounds and occasionally carry twenty-one to fifty pounds. Id. She could sit or stand for two hours without interruption. R. at 277. In an eight-hour work day, Plaintiff could sit for four hours, stand for three hours, and walk for one hour without interruption. Id. Dr. Van Gorder did not identify specific medical or clinical findings that supported these conclusions. See R. at 276-77.

On November 9, 2011, physician's assistant Thomas Jones ("Jones") completed a medical

4

questionnaire regarding Plaintiff's condition. R. at 295-97. Jones opined that Plaintiff required complete freedom to rest frequently without restriction and could expect to miss more than four work days per month. R. at 295. Plaintiff could only sit for less than six hours out of an eight-hour day and needed to alternate positions between sitting and standing. Id. Plaintiff could stand for at least two hours out of an eight-hour day. R. at 296. Plaintiff could only lift five pounds for up to three hours per day. Id. Jones concluded that Plaintiff's medical condition severely impacted Plaintiff's abilities in the workplace. Id. Jones noted Plaintiff's chronic left knee problems, low back pain, and other symptoms as the basis for this conclusion. R. at 297.

On November 21, 2011, Dr. Van Gorder also completed a medical questionnaire about Plaintiff's condition. R. at 298-300. Dr. Van Gorder opined that Plaintiff required complete freedom to rest frequently without restriction. R. at 298. Plaintiff could only sit for less than six hours out of an eight-hour day and needed to alternate positions between sitting and standing. Id. Plaintiff could stand for at least two hours out of an eight-hour day. R. at 299. Plaintiff could lift ten pounds for up to three hours per day and five pounds for three to eight hours per day. Id. Dr. Van Gorder concluded that Plaintiff's medical condition mildly or moderately impacted Plaintiff's abilities in the workplace. Id. Dr. Van Gorder noted Plaintiff's left knee replacement and right hip replacement as the basis for these conclusions. Id.

**B. ALJ Hearing**

After the SSA determined that Plaintiff was not disabled, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. at 40. On December 9, 2011, ALJ Bruce S. Fein conducted a hearing regarding Plaintiff's claim for Social Security Title II benefits. Id.

At the hearing, Plaintiff's attorney explored Plaintiff's past work experience and functional

capacity. R. at 43-55. Plaintiff testified that she had previously worked as forklift operator, line operator, cleaner, and childcare provider. R. at 43-44. Plaintiff hurt her left knee when she was working as a forklift operator in 2007, and her left knee was still swollen at the time of the hearing. R. at 45. Plaintiff stated that she worked eight hours per day as a forklift operator prior to the incident. R. at 46. She received an arthroscopic surgery in 2007 following the incident and returned to work in 2008. R. at 47. Plaintiff testified that she worked for six months after returning to work in 2008, and stopped working when the plant went out of business. R. at 48. Plaintiff's next period of employment lasted six months, in which she worked at a standing job that required her to stand eight hours per day. Id. Plaintiff stated that she lost that job due to the swelling in her knee and back and hip pain. Id. After the knee replacement surgery was scheduled, Plaintiff testified that she followed Dr. Van Gorder's advice and tried to lose weight prior to the surgery. R. at 51-52. Plaintiff stated that she failed to lose weight as the stair stepper and exercise bike she used caused pain in her knee and hip. R. at 52. When asked about her symptoms, Plaintiff testified that she had constant swelling, stiffness, and pain in her knee. R. at 53. Due to these symptoms, Plaintiff stated that she generally sits on the edge of a chair so she can stretch her leg. Id. Plaintiff also testified that her back would stiffen up and start hurting after sitting in a regular chair for fifteen minutes. R. at 53-54. As a result of her hip pain, Plaintiff stated that she stopped playing with her niece. R. at 54. Plaintiff testified that she could not squat or take laundry to the basement. Id. However, Plaintiff could put the laundry in the machine and vacuum for ten to fifteen minutes. R. at 55.

  ALJ Fein questioned Plaintiff about her pain and the amount of weight she could lift. R. at 56-59. Plaintiff testified that her back pain radiated to the back of her legs, causing cramps in her legs. R. at 56. When asked about the causes of her back pain, Plaintiff stated that sitting for twenty

6

minutes or standing for thirty minutes could cause back pain. R. at 57-58. Plaintiff testified that she started stiffening up after walking for thirty to forty-five minutes. R. at 58. Plaintiff stated she could lift up to ten pounds. R. at 59.

Following the ALJ's questions, Plaintiff's attorney asked Plaintiff more questions about her daily life. Plaintiff's favorite job was driving a forklift. R. at 64. Plaintiff stated that she could not do a sedentary job due to the stiffness and pain in her back, and that she had to walk around in order to alleviate her pain. R. at 65. Apart from watching TV and cleaning her house, Plaintiff sometimes baked for church and would spread the baking work over several days to alleviate pain. R. at 66. A doctor had recommended that Plaintiff use a cane and she had been using one since her hip replacement. R. at 69. When asked about her reason for not pursuing a job in childcare, Plaintiff testified that she could not do childcare work anymore due to her pain. R. at 74.

### C. Procedural History

On June 14, 2010, Plaintiff protectively filed an application for disability insurance benefits, alleging disability with an onset date of August 1, 2009. R. at 142-43. The application was denied on October 4, 2010. R. at 84-86. On November 29, 2010, Plaintiff filed a request for a hearing with an ALJ. R. at 88. On December 9, 2011, Plaintiff appeared with counsel for a video hearing before ALJ Bruce S. Fein, who presided over the hearing from Syracuse, New York. R. at 38.

The ALJ issued a decision on January 17, 2012, finding that Plaintiff had not engaged in any substantial gainful activity since August 1, 2009, the alleged onset date of disability. R. at 14. While the ALJ found that Plaintiff had severe impairments of status post left knee replacement, he also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404(P) Appendix I.

Id. The ALJ considered Plaintiff's diabetes, high blood pressure, and obesity, and found that these impairments were not severe since no evidence showed that they significantly affected Plaintiff's ability to perform basic work activities. Id. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined by 20 C.F.R. § 404.1567(a), including lifting and carrying ten pounds occasionally and frequently, sitting for six hours in an eight-hour workday, standing or walking for less than six hours in an eight-hour workday, occasionally performing all postural activities, and avoiding hazards. R. at 15. The ALJ stated that Plaintiff's impairments prevented her from performing any of her past relevant work. R. at 18. However, given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Id. Therefore, under the standards set forth in the Social Security Act, the ALJ concluded that Plaintiff was not disabled between August 1, 2009, the alleged onset date of disability, and January 17, 2012, the date of decision. R. at 19. Plaintiff filed a request for review on January 25, 2012. R. at 8. On June 7, 2013, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the SSA Commissioner ("Commissioner"). R. at 1-5. Plaintiff timely filed an appeal on June 24, 2013. Dkt. No. 1 ("Complaint").

## III. LEGAL STANDARD

### A. Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if her decision is supported by substantial evidence in the Record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if it might justifiably have reached a different result upon a *de novo* review.'" Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333 F. App'x

609, 610 (2d Cir. 2009). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed with the analysis. Id.

At step one, the SSA considers whether the claimant's current work is "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it is, the claimant is not disabled under the SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such an impairment, the claimant is not disabled under the SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA continues to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under the SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV. DISCUSSION

Plaintiff argues that the Commissioner's final decision was not based on substantial evidence because the ALJ: (1) failed to assess all severe impairments in his step two determination; (2) failed to accord proper weight to medical opinions; (3) failed to show substantial evidence that

supports his RFC determination; and (4) failed to satisfy the burden of proof required in the step five determination. Pl.'s Br. at 7-20.

**A. Step Two Determination**

Plaintiff argues that the ALJ erred by failing to discuss Plaintiff's status post–hip replacement and obesity in step two of the SSA's five-step analysis and for failing to find that Plaintiff's status post hip replacement constituted a severe impairment. Pl.'s Br. at 7-9. To determine whether a claimant suffers from a severe impairment under the step two determination, the ALJ must consider whether the claimant has any condition or conditions which "significantly limits [his or her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Furthermore, to be considered disabling, the condition must be expected to result in death or must have lasted or be expected to last at least twelve continuous months. 42 U.S.C. § 423(d)(1)(A).

Plaintiff's status post–hip replacement was not a severe impairment under the definition required by the step two determination. Plaintiff's hip replacement took place in 1995 due to a fracture initially diagnosed in 1979, whereas her alleged disability began in 2009. R. at 261. She reported that her hip was much better after the replacement, and that she had no complications from the replacement. Id. Plaintiff also stated that she was able to return to work after the replacement, but had some mild persistent pain in her left hip during walking or any exertion. Id. Therefore, it was not error for the ALJ to find that Plaintiff's status post–hip replacement was not a severe impairment. Plaintiff additionally contends that the medical records establish that Plaintiff "experiences limitations as a result of *both* her left knee *and* her right hip." Pl.'s Br. at 8. However, the ALJ did find that Plaintiff's status post–left knee replacement was a severe impairment by itself. R. at 14. With respect to Plaintiff's obesity, the ALJ discussed it and found that it was not a severe

11

impairment because there was no evidence showing that it significantly affected Plaintiff's ability to perform basic work activities. Id.

Plaintiff further argues that the ALJ's failure to mention status post hip replacement in the decision warrants reversal because this omission shows that the ALJ failed to properly consider all the medical evidence and impairments. Pl.'s Br. at 8-9. Plaintiff uses records from Dr. Boehlert, Dr. Van Gorder, and physician's assistant Thomas Jones to argue that her status post hip replacement imposed limitations on her RFC. Id. However, in the analysis of Plaintiff's RFC, the ALJ did consider all the evidence enumerated by Plaintiff in her brief. See R. at 16-17. For instance, the ALJ referred to Dr. Van Gorder's May 2010 diagnosis and Dr. Boehlert's September 2010 examination in the RFC analysis, both of which mentioned Plaintiff's hip replacement. Id.; R. at 251, 261-65. Furthermore, the ALJ specified that he had "considered all of [Plaintiff's] impairments individually and in combination." R. at 15. Therefore, though the ALJ did not directly discuss Plaintiff's hip replacement in the RFC analysis, no evidence suggests that he overlooked any medical evidence under which the status post hip replacement can be found to be a severe impairment.

**B. Proper Weighing of Medical Opinions**

*1. Dr. Van Gorder*

Treating physicians' opinions are to be given controlling weight if they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence on record. Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(c)(2). Plaintiff argues that the ALJ failed to properly give controlling weight to the medical opinions of Dr. Van Gorder, Plaintiff's treating physician. Pl.'s Br. at 16-18. In his

medical source statement, Dr. Van Gorder opined that Plaintiff could sit for four hours, stand for three hours, and walk for one hour in an eight-hour workday. R. at 277. Plaintiff points out that (1) Dr. Van Gorder is the only specialist of record; (2) Dr. Van Gorder had a long-term relationship with Plaintiff; (3) Dr. Van Gorder's opinions are amply supported by medical evidence; and (4) Dr. Van Gorder's opinions are consistent with Dr. Boehlert's opinions, to which the ALJ gave great weight, and Thomas Jones's opinions. Pl.'s Br. at 17-18.

The ALJ properly accorded little weight to Dr. Van Gorder's medical opinions because they were inconsistent with Plaintiff's medical records. A treating physician's opinions are given "controlling weight" where they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). However, a treating physician's opinions "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). Where an ALJ does not assign controlling weight to a treating physician's opinions, the ALJ must then consider the following factors in determining the appropriate weight to assign the opinons:

> (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the opinion is supported by relevant evidence; (iv) the consistency of the opinion with the record as a whole; (v) specialization; and (vi) other factors.

20 C.F.R. § 404.1527(c).

The ALJ accorded Dr. Van Groder's opinion that Plaintiff could sit for four hours, stand for three hours, and walk for one hour in an eight-hour workday little weight because it was inconsistent with the medical evidence in the record and was not supported by specific objective findings. R. at

13

17. First, Dr. Van Gorder's opinion was contrary to his own treatment notes. In May 2009, Dr. Van Gorder noted patellofemoral arthrosis of Plaintiff's left knee was confined to her patellofemoral joint, and the remainder of her knee did not look bad. R. at 258. In November 2009, Dr. Van Gorder noted that after the operation Plaintiff was doing very well, had full extension of the knee, could move her foot without difficulty, and X-rays revealed excellent alignment of prosthetic components. R. at 256. In May 2010, Dr. Van Gorder noted that in general Plaintiff had been slowly improving and she could perform a sit-down job. R. at 251. In March 2011, Dr. Van Groder noted that Plaintiff had "full extension" and that "[h]er gait [was] satisfactory." R. at 274. Second, Dr. Van Gorder did not identify medical or clinical findings that supported his conclusion that Plaintiff could only sit for four hours, stand for three hours, and walk for one hour in an eight-hour workday. See R. at 276-77.

     Moreover, contrary to Plaintiff's assertions, Dr. Van Gorder's medical opinions were not consistent with Dr. Boehlert's medical opinions. Dr. Van Gorder's previous treatment notes, which suggested that Plaintiff's gait was improving and had swelling in her left knee and some difficulties with prolonged walking, were consistent with Dr. Boehlert's opinions, which suggested that Plaintiff had (1) moderate limitation to repetitive standing and sitting, (2) mild to moderate limitation to heavy ambulation, and (3) moderate limitation to heavy exertion in the standing position. Compare R. at 251-52, 254, with R. at 264. However, Dr. Van Gorder's later medical opinions, which suggested that Plaintiff could only sit for four hours, stand for three hours, and walk for one hour in an eight-hour workday, were not consistent with Dr. Boehlert's opinions. Compare R. at 276-77, with R. at 264. Finally, the fact that Dr. Van Gorder's opinions were consistent with Thomas Jones's opinions is immaterial, since the ALJ properly accorded no weight to Thomas

14

Jones's opinions as discussed *infra*. R. at 17.

The ALJ therefore properly accorded little weight to Dr. Van Groder's medical opinions because they were inconsistent with the medical evidence as a whole and unsupported by objective findings.

### 2. *Thomas Jones*

Plaintiff also argues that the ALJ erred in giving no weight to Physicians's Assistant Thomas Jones's ("Jones") opinions. Pl.'s Br. at 18-19. Relying on Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008), Plaintiff points out that Second Circuit case law suggest that physicians' assistants' opinions may not simply be discounted and disregarded. Id. at 18. Furthermore, relying on Saxon v. Astrue, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011), Plaintiff points out that an ALJ has an affirmative duty to address and discuss physicians' assistants' opinions. Id.

The ALJ properly accorded no weight to Thomas Jones's opinions. First, an ALJ is not required to explain the weight given to opinions from sources such as a physician's assistant. See 20 C.F.R. § 404. 1513(d)(1); Social Security Ruling ("SSR") 06-03p. Second, contrary to Plaintiff's interpretation of the case law, in Genier v. Astrue, the Second Circuit held that an ALJ is "free to discount the assessments [of a physician's assistant or a nurse practitioner] accordingly in favor of the objective findings of other medical doctors." Genier, 298 F. App'x 108-09. Though the Saxon court held that an ALJ has an affirmative duty to address opinions by non-acceptable medical sources and explain the weight assigned to those opinions, see Saxon, 781 F. Supp. 2d 104 (holding that the ALJ must address a social worker's opinion and explain the weight he assigned to that opinion), the ALJ in the instant case clearly stated that he evaluated Thomas Jones's opinion and found that it deserved no weight. R. at 17-18. Finally, unlike in White v. Commissioner of Social

Security, 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004), where the social worker was the sole source that had a regular treatment relationship with the claimant, Thomas Jones was not the sole source that had a regular treatment relationship with Plaintiff, and his opinion was therefore not critically important to the ALJ's decision, R. at 17-18. See also Saxon, 781 F. Supp. 2d at 104 (noting that social worker's opinions were important because "she was the only treating source").

### 3. Dr. Putcha

Plaintiff further argues that the ALJ erred in affording Dr. Putcha's opinion great weight. Pl.'s Br. at 10. In support, Plaintiff points out that: (1) the ALJ failed to explain why Dr. Putcha's opinion deserved great weight; (2) Dr. Putcha is not a specialist; (3) Dr. Putcha never examined Plaintiff; (4) Dr. Putcha did not consider all relevant records; (5) Dr. Putcha's evaluation did not constitute an evaluation; and (6) Dr. Putcha's findings were contrary to findings of examining physicians and physician's assistant. Id. at 10-12.

The ALJ properly afforded Dr. Putcha's opinion great weight. First, an ALJ is not required to analyze every factor in the regulations when his or her reasoning and adherence to the regulation are clear. Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013). Here, the ALJ explained that he gave great weight to Dr. Putcha's opinions because they were consistent with the medical record and because Dr. Putcha considered the entire record. See R. at 17.

Relying on Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008), Plaintiff first argues that under Second Circuit precedent the ALJ is required to provide a "comprehensive" explanation while addressing the factors set forth in 20 C.F.R. § 404.1527(c). Pl.'s Br. at 10-11. This contention oversimplifies the law, since in Burgess the Second Circuit only required the ALJ to provide a comprehensive explanation when the ALJ assigns weight to a treating physician's opinion. Burgess,

16

537 F.3d 129 ("[T]he ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'").

Second, "[s]tate agency medical and psychological consultants . . . are also experts in Social Security disability evaluation," and an ALJ must consider their findings and opinions as opinion evidence. 20 C.F.R. § 404.1527(e)(2)(i); see also SSR 96-6p ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims under the Act."). The medical consultant's speciality is only one factor to be considered in determining the weight to assign to their opinion. SSR 96-6p. Therefore, the fact that Dr. Putcha is not a specialist is not determinative.

Third, a non-examining source's opinion may override the opinions of treating sources, "provided they are supported by evidence in the record." Santos-Sanchez v. Astrue, 723 F. Supp. 2d 630, 638 (S.D.N.Y. 2010) (citing Schisler, 3 F.3d at 568). Plaintiff argues that Dr. Putcha's opinion deserves less weight under Schisler, since Dr. Putcha offered no meaningful supporting explanation for his opinion. Pl.'s Br. at 11 (citing Schisler, 3 F.3d at 571). However, Dr. Putcha stated that his conclusion was based on treating physician's treatment notes and the medical records. R. at 78-83, 267-68.

Fourth, though Dr. Puchta's opinion relied on records available prior to October 1, 2010, an ALJ is not required to receive an updated report from the state medical experts whenever new evidence is available, unless the additional evidence may change the state medical experts' opinions. Wilson v. Astrue, 331 F. App'x 917, 919 (3d Cir. 2009) (citing 20 C.F.R. § 404.1527(e)(2)(i) and SSR 96–6p). Here, the additional evidence would not have changed Dr. Putcha's opinion because the records that predated Dr. Putcha's October 1, 2010 evaluation showed that Plaintiff had a greater

17

level of impairment than the records available after this evaluation. For instance, in July 2010 Dr. Van Gorder noted that Plaintiff had a temporary impairment in her left knee at seventy-five percent loss. R. at 250. However, in March 2011 Dr. Van Gorder opined that Plaintiff's impairment in her left knee had improved to a fifty percent loss. R. at 293. Furthermore, Dr. Van Gorder's and Jones's later medical questionnaires need not be considered by Dr. Putcha due to their inconsistency with Plaintiff's medical records. R. at 17.

Fifth, contrary to Plaintiff's argument that Dr. Putcha did not conduct an evaluation, Dr. Putcha stated that his conclusion was based on the treating physician's treatment notes and the medical records. R. at 78-83, 267-68. The ALJ therefore properly found that Dr. Putcha's opinion was based on the medical evidence. R. at 17. Finally, Dr. Putcha's opinion was not contrary to the other medical opinions in the record. Dr. Putcha reached his opinion after taking into account Plaintiff's limitations in sitting, standing, and walking, and her need to change positions frequently, as noted by the other doctors in their records. R. at 267-68.

**C. RFC Determination**

Plaintiff argues that the ALJ's RFC determination was incorrect in light of the fact that Plaintiff needs to frequently alternate position between sitting and standing. Pl.'s Br. at 13-16. Plaintiff's argument is unfounded. First, the ALJ did consider the fact that Plaintiff needs to frequently alternate positions between sitting and standing, which was mentioned by Dr. Boehlert. R. at 17 (giving "[g]reat weight to [Dr. Boehlert] . . . who found moderate limitation to repetitive standing, sitting"). Plaintiff cites Dr. Van Gorder and Thomas Jones's medical questionnaires, arguing that those opinions showed that Plaintiff could not sit for six hours, thus precluding her from performing sedentary work. Pl.'s Br. at 13. However, the ALJ assigned those two medical

questionnaires little weight and no weight, respectively.  R. at 17.  Second, the Second Circuit has held that the need to frequently alternate positions does not preclude a claimant's ability to perform sedentary work.  Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("The regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.").  Therefore, the medical records that Plaintiff "should change positions frequently," R. at 264, and needs to alternate positions between sitting and standing, R. at 295, do not contradict the ALJ's finding that Plaintiff can "sit for six hours and stand or walk for less than six hours in an eight hour workday," R. at 15.

**D. Step Five Determination**

Plaintiff argues that the ALJ erred in the step five determination, which found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  Pl.'s Br. at 13-16, 19-20.  In particular, Plaintiff argues that the ALJ failed to meet his burden of proof because the step five determination was based on an erroneous RFC determination and the ALJ failed to obtain a vocational expert's testimony even though he was obliged to do so.  Pl.'s Br. at 19-20.  However, as discussed *supra*, the ALJ's RFC determination is supported by substantial evidence.  Moreover, under SSR 83-12, the ALJ is not obliged to elicit testimony from vocational experts when a claimant's RFC falls within the categories of the grids.  Gravel v. Barnhart, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005) ("The purpose of SSR 83-12 is to clarify the use of the Grids as a framework for disability determinations when an individual's exertional RFC does not fall within any of the categories of work as defined in sections 404.1567 and 416.967 of the Regulations.").  Yet Plaintiff has not established that her need to frequently alternate positions makes her RFC fall

19

outside of the definition of sedentary work. Therefore, the ALJ's failure to elicit testimony from a vocational expert does not constitute an error in the step five determination.

V.     **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED**.

DATED:     September 30, 2015
           Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge